plaintiffs did not acquiesce in this. They notified the defendant that they regarded the contract as valid, and intended to deliver milk thereunder, and that if the defendant paid less than the contract price, it would be credited on the account, and they would sue for the balance. After this notice, the defendant continued to receive milk from the plaintiffs, and from time to time rendered statements, at the foot of which was "To check in full." The checks did not recite that they were in full payment. The plaintiffs used the checks, but gave no receipt. It was held that this did not constitute an accord and satisfaction, and that the plaintiffs were entitled to recover according to contract. Here if the plaintiff had refused to accept the draft in full settlement of the claim, and had asserted her intention of suing for the full amount of the claim, or with the consent of the defendant's officers had accepted the draft on the understanding that it was to be without prejudice to her right to sue for the balance, or had expressly reserved her right to sue for the balance, then the receipt and the draft could be explained, and it would appear that there was not a final settlement made. She merely signed the receipt and accepted the draft under protest, but gave no notice to the defendant that she intended to sue for the balance until after she received the draft, when she demanded the balance, and stated that she would bring an action. I am inclined to the view that, as matter of law, on this evidence the plaintiff accepted the draft on the terms offered by the defendant in full settlement of her claim; but certainly, at most, this was a question for the jury, and could not have been resolved against the defendant as matter of law.

---

(109 App. Div. 139.)

MILLIMAN v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department. November 22, 1905.)

1. RAILROADS—CROSSING ACCIDENT—NEGLIGENCE—FAILURE TO GIVE SIGNALS.
   Where, in an action for injuries from a collision between the wagon in which plaintiff was riding and a locomotive at a highway crossing, it appeared that the parties in the wagon saw the approach of the locomotive in time to have avoided the collision, there could be no recovery because of the fact that the locomotive did not give warning signals.
   [Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, §§ 1080, 1087.]

2. JUDGES—QUALIFICATION—TERMINATION OF TERM OF OFFICE.
   Where after the trial of a cause the trial justice became a member of the Appellate Division, he had no jurisdiction thereafter to decide a motion for a nonsuit reserved at the trial.

Appeal from Trial Term, Wayne County.

Action by Amass O. Milliman against the New York Central & Hudson River Railroad Company. From a judgment in favor of plaintiff and from an order denying a new trial, defendant appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and NASH, JJ.

Daniel M. Beach, for appellant.
A. Lee Olmstead, for respondent.

NASH, J.   The plaintiff, with four other men, was in a lumber wagon driving south on the highway toward the railroad crossing near the defendant's station at Red Creek, Wayne county, on the R. W. & O. R. R.   The driver, Milton Jenkins, owner of the team and wagon, sat on the front seat, and with him one Becker.   On the next seat (a board across the top of the wagon box) were the plaintiff, sitting to the left, and Burgess Jenkins, the father of Milton, on his right or west side.   The fifth man, Qureau, was on a seat in the rear.   As they approached the railroad crossing, they were stopped by an eastbound freight train, which had pulled into the station, and, it being a down grade to the east, the train did not come to a stop until the engine was some distance east of the high-way crossing.   The train was backed up, and placed 200 or 300 feet west of the highway, where some of the cars were uncoupled, and were shifted back and forth across the highway on the main track and a siding on the south, the nearest rails of the two tracks being nine feet apart, and were connected by a cross, over which started from the siding or south track at a point east of the highway, and crossing the highway, and was connected with the main track 95 feet west of the center of the highway.   The party in the wagon stopped first on a knoll some 200 feet to the north of the track, and remained there about 10 minutes, while the engine was switch-ing cars back and forth over the highway.   The wagon was then moved down into a hollow, 100 feet or more from the track, from which point there is a rise to the track.   There they waited until the wagon was moved back toward the train.   The driver then started the horses on a walk to cross the track, and while they were walking the engine ran down over the crossover far enough beyond the switch to reverse and come back on the main track. When the party saw the engine coming back, the driver was about 40 feet, and the horses heads about 28 feet, from the track.   He then whipped the horses into a run, and crossed in front of the engine, which missed the rear end of the wagon by from 4 to 6 feet.
Burgess Jenkins says:

"The engine backed west, and as it crossed the crossing my son started the team, and when the engine had got to the branch west of the crossing, or the switch, it reversed—stopped and reversed—and we were under head-way to cross, and I began to measure the distance between the engine and the crossing and our team and the crossing, and began to be alarmed in re-gard to our ability to cross.   The Court.   What was the distance at that time?   A. I should think about forty feet or such a matter.   Q. From where you were in the wagon to the crossing?   A. At the time the engine reversed; yes.   Q. How far was the engine?   A. I should think it was about—of course, I didn't measure it, but I should think it was about two rod above the branch, west of the switch; that is about my best judgment.   The rapidity of the exhaust alarmed me more, and I saw my son was urging the team forward, and I rose up in the wagon.   I kept my eye on the engine, and rose up in the wagon, and just about when we were on the tracks I jumped; feared we were going to be struck by the engine.   To the best of my recol-lection Milliman was sitting to the left of me.   I rose, stood up in the wagon box, stepped in front of Milliman, and over the box, onto the step or running board outside of the box, and jumped.   I think my left foot struck the rail; that is, between the plank crossing and the sidewalk.   I next saw Milliman on the ground."

The plaintiff says:

"We stood down there at the foot of the grade I should think ten minutes. When we started up from down at the foot of the grade, the engine was coming; going back toward the main track over the crossover. As we came along up the grade, the engine ran back onto the main track, and there was a man there. After she ran back of the switch a little, he whirled the switch, swung up his hand so, and he pulled it wide open, and let her come right down. I could see the switchman and the engine perfectly plain at that time. Nothing between and nothing to prevent their seeing me. As the engine was opened up, the horses were still on a trot. When I heard the engine opened up, Milton put the whip to the team. He commenced whipping the horses and getting off the track, and Burgess Jenkins raised up, and he swung his hands so toward the engine. It kept coming near to us, and he raised up and I partially raised. The wagon ran over the end of the plank—one wheel —the hind part of the wagon ran over the end of the plank and bob along that way, and he went out, and I partially raised as he went out, and he took me out with him. Of course I went onto the ground. The team passed us. I undertook to get up. I couldn't get up. I struck on my head and shoulders. The wheel of the wagon throwed me; the hind wheel, on the nigh side of the wagon, pitched me forward on the ground onto my head and shoulders."

The engineer says he saw the team back on the knoll, but did not observe it afterwards until the horses' heads were near the track, and his engine was about half way between the switch and crossing, when he shut off steam and applied the brake. The negligence alleged is that no signal was given at the time the engine was reversed and came back toward the crossing. The court charged the jury that when the engineer backed the engine west of the crossing, stopped, reversed, and started in an easterly direction, he was bound to give reasonable and timely warning or notice that he proposed to run his locomotive over the crossing.

We are of the opinion that it is not a question of signals. The defendant had the right, as stated in the charge, to shift cars at stations, and had a perfect right to block the highway in the manner described by the witnesses; in other words, the defendant had the right of way. As stated by the court in Warner v. N. Y. C. & H. R. R. Co., 44 N. Y. 469, the citizen must yield the right of way at highway crossings, and if one sees cars approaching a crossing, it is his duty to wait until they have passed. Signals would not have given the occupants of the wagon any more notice of the approach of the engine than they had at the time the men in the wagon were 40 and the horses 28 feet from the crossing. Qureau says: "I could see the engine all the time as we were going up the incline." Becker says he heard the lever when the engine was reversed. Then he looked, and saw that the engine was coming. The language of the court in Pakalinsky v. N. Y. C. & H. R. R. Co., 82 N. Y. 427, is applicable to the case here:

"The sole object of ringing a bell upon an engine is to notify the persons who might be upon or near a railroad crossing of the approach of the engine, so that they can get or keep out of the way. If one sees the engine, and knows that it is approaching, he needs not the warning of the bell, and as to him it is useless to ring it. Here the plaintiff saw the engine, at first standing still, then starting and going westerly, and then backing easterly toward him, and while he was endeavoring to run across the tracks, one of his feet became fastened between a rail and planking, and he fell down and was run

over. He thus had all the notice the ringing of the bell could have given him, and the omission to ring it had nothing whatever to do with the accident."

Upon the facts shown by the plaintiff, the defendant was entitled to a nonsuit.

Without regard to the disposition made of the question which we have discussed, the judgment must be. reversed. The trial justice having become a member of the Appellate Division of the Second Department, he had no power or jurisdiction thereafter to hear and decide. The motion for a nonsuit reserved at the trial was heard and decided. French v. Merrill, 27 App. Div. 612, 50 N. Y. Supp. 776.

Judgment reversed, with costs to the appellant to abide the event, upon questions of law only; the facts having been examined, and no error found therein. All concur; SPRING, WILLIAMS, and HISCOCK, JJ., upon the ground of mistrial only.